IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Estate of Doretha Green,      :
               Petitioner      :
                   :
       v.      :
                   :
Commonwealth of Pennsylvania,      :
Treasury Department, Bureau of      :
Unclaimed Property,      :    No. 749 C.D. 2021
              Respondent      :    Argued: March 7, 2022


BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: September 21, 2022

The Estate of Doretha Green (Green) (Estate) petitions this Court for review of the Commonwealth of Pennsylvania, Treasury Department (Treasury), Bureau of Unclaimed Property's (Bureau) June 10, 2021 Final Decision and Order (Final Decision) denying Claim No. 79582684 (Claim). The sole issue before this Court is whether Treasury erred by concluding that the Estate failed to prove its entitlement to the proceeds of a RiverSource Life Insurance Company (RiverSource) Annuity Contract No. 9920-6074352 (Property I.D. #22404849) (Annuity)[1] Treasury held pursuant to the portion of The Fiscal Code commonly referred to as

---

[1] According to the Fixed Annuity Application (Application), American Enterprise Life Insurance Company issued the Annuity. *See* Reproduced Record at 2f; *see also* Estate Br. at 25a. However, then holder RiverSource reported the Annuity to Treasury. Treasury presumed that RiverSource was successor to American Enterprise Life Insurance Company. *See* Treasury Br. at 4 n.2.

the Disposition of Abandoned and Unclaimed Property Act (Act).[2, 3] After review, the Court vacates Treasury's Final Decision and remands the matter to Treasury for further proceedings consistent with this Opinion.

In 2003, Green purchased the non-qualified, single payment Annuity from RiverSource for $44,140.94, naming herself as the annuitant/owner. *See* Reproduced Record (R.R.) at 2f;[4] *see also* Estate Br. at 25a. The Annuity allowed Green to access its funds during her lifetime.[5] In Section 2 of the Fixed Annuity Application (Application), where Green could name a primary beneficiary, the instructions specified: "(Name, relationship to Annuitant; if unrelated, include [Social Security number.]" R.R. at 2f; Estate Br. at 25a. Green designated "Mildred Williams - Friend" as the Annuity's primary beneficiary, but did not supply a Social Security number or any other identifying information for Mildred Williams. *Id.*

---

[2] The Estate presents four issues in its Statement of Questions Involved: (1) whether Treasury perpetrated an injustice by refusing to release the Annuity proceeds to the Estate when the beneficiary appointment is insufficiently specific to identify a particular claimant as the beneficiary; (2) whether an insurance policy with an unascertainable beneficiary is the equivalent of an ineffective beneficiary designation and, if so, should the proceeds be paid to the insured's estate; (3) whether Treasury may retain the Annuity proceeds despite the Philadelphia County Common Pleas Court, Orphans Court Division's Decree directing RiverSource to remit them to the Estate; and (4) whether *Mildred Williams - Friend* is sufficient to identify the intended beneficiary with reasonable certainty and/or to assure the intended Mildred Williams did not predecease Green. *See* Estate Br. at 4-5. Because these issues are subsumed in this Court's analysis of whether Treasury erred by concluding that the Estate failed to prove its entitlement to the Annuity, they have been combined and will be addressed accordingly herein.

[3] Act of April 9, 1929, P.L. 343, *as amended*, added by Section 5 of the Act of December 9, 1982, P.L. 1057, 72 P.S. §§ 1301.1-1301.29. Treasury is charged with safekeeping and administering unclaimed property under the Act. *See* Sections 1301.14 and 1301.20 of the Act, 72 P.S. §§ 1301.14, 1301.20.

[4] Although the Estate numbered the Reproduced Record pages, it did not comply with the Pennsylvania Rules of Appellate Procedure. *See* Pa.R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures . . . thus 1, 2, 3, etc., followed in the reproduced record by a small a, thus 1a, 2a, 3a, etc."). However, for consistency of reference, the citations herein are as reflected in the Reproduced Record.

[5] The Annuity allowed Green to receive payments therefrom subject to the following withdrawal charges: Year 1 - 8%, Year 2 - 7%, Year 3 - 6%, Year 4 - 4%, Year 5 - 2%, and Year 6 - 0%. *See* R.R. at 2f; Estate Br. at 25a.

On November 1, 2005, the Pennsylvania Department of Human Services (DHS)[6] began providing Medicaid[7] benefits for Green's nursing home care,

---

[6] DHS was formerly known as the Pennsylvania Department of Public Welfare.

[7] "Medicaid is a cooperative federal-state program that provides medical care to needy individuals." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012). "Pursuant to Section 442.1 of the [Human Services] Code, Act of June 13, 1967, P.L. 31, *as amended*, . . . added by Act of July 31, 1968, P.L. 904[, 62 P.S. § 442.1], [DHS] is authorized to establish eligibility standards for the medically needy." *Steinberg v. Dep't of Pub. Welfare*, 758 A.2d 734, 734 n.1 (Pa. Cmwlth. 2000). "[DHS] is the payer of last resort under the Commonwealth's statutory scheme. [*See* Section 178.6(a) of DHS's Regulations,] 55 Pa. Code § 178.6(a)." *Colonial Park Care Ctr., LLC v. Dep't of Pub. Welfare*, 123 A.3d 1094, 1097 (Pa. Cmwlth. 2015). Accordingly, "[a]ll assets and resources that are available to pay for medical services and care . . . must be made available and used to the fullest extent possible before [DHS] . . . makes any payments to cover medical expenses." *Sams v. Dep't of Pub. Welfare*, 74 A.3d 408, 412 (Pa. Cmwlth. 2013).

> If an applicant disposes of assets for less than fair market value during the 'look-back' period, [DHS] presumes that the transfer was made to qualify for [Medicaid]. The applicant may rebut the presumption by establishing that the individual intended to dispose of the assets for fair market value, the assets were transferred exclusively for a purpose other than to qualify for [Medicaid], or the assets transferred for less than fair market value were returned to the applicant. [*See* Section 178.105 of DHS's Regulations,] 55 Pa. Code § 178.10[5].

> *Steinberg*, 758 A.2d at 736. "If the applicant fails to rebut the presumption, then [she] will be disqualified from receiving [Medicaid] for a period equal to the number of months of average nursing home care that the transferred assets could have purchased." *Colonial Park Care Ctr.*, 123 A.3d at 1097.

*Brenckman v. Dep't of Hum. Servs.*, 222 A.3d 38, 43 (Pa. Cmwlth. 2019) (footnotes and emphasis omitted). When Green purchased the Annuity in 2003, the look-back period was three years before the date she was institutionalized and applied for Medicaid. *See* Section 178.104(c) of DHS's Regulations, 55 Pa. Code § 178.104(c). Moreover, although not distinguished in DHS's Regulations at the time, the presumption was applied to annuities. *See Dempsey v. Dep't of Pub. Welfare*, 756 A.2d 90 (Pa. Cmwlth. 2000).

In 2007, DHS promulgated in Section 178.104a(h) of DHS's Regulations that annuities purchased on or after February 8, 2006 that do not satisfy certain requirements are assets transferred for less than fair market value. *See* 55 Pa. Code § 178.104a(h); *see also* Section 178.104a(i)-(j) of DHS's Regulations, 55 Pa. Code § 178.104a(i)-(j); *Sams*.

medical treatment, and medication, after she represented that she did not have the funds to pay for her care. Green did not disclose the Annuity to DHS.

Green died on September 25, 2006. In 2009, DHS's Estate Recovery Program initiated estate proceedings in the Philadelphia County Common Pleas Court, Orphans Court Division (Orphans Court), and DHS was appointed as the Estate's executor. DHS thereafter appointed Allen L. Cohen, Esquire (Cohen) as successor executor for the Estate. Cohen discovered the Annuity while examining Green's effects. According to the Estate, it requested the Annuity from RiverSource, and RiverSource declined to pay the Estate.[8]

In 2016, after having been unable to identify Mildred Williams with particularity and deliver it to her, RiverSource reported and transferred the Annuity (then valued at $61,921.81) to the Bureau in accordance with the Act. *See* Final Dec. at 3 ("River[S]ource . . . escheated the [Annuity] to the Bureau in 2016 . . . ." Finding of Fact 4); *see also* R.R. at 3a (Bureau Claim Information); Treasury Br. at 4. On May 11, 2016, the Orphans Court issued a Decree *Pro Confesso*,[9] in which it ordered RiverSource to pay the Estate $85,988.10, plus $1,000.00 in attorney's fees (Orphans Court Decree).[10] *See* Estate Br. at 25b.

The Estate filed the Claim with the Bureau for the Annuity.[11] On January 23, 2020, the Bureau requested additional information from the Estate to support the Claim. On April 20, 2020, at the Bureau's request, the Estate supplied a copy of the Settlement Statement for Green's property at 6531 Lambert Street,

---

[8] The record evidence is not clear as to when the Estate requested the Annuity from RiverSource.

[9] A decree *pro confesso* is "[a] decree entered in favor of the plaintiff as a result of the defendant's failure to timely respond to the allegations in the plaintiff's bill; esp., a decree entered when the defendant has defaulted by not appearing in court at the prescribed time." Black's Law Dictionary 517 (11th ed. 2019).

[10] Notably, although the Orphans Court Decree referenced an annuity, it did not specifically reference the Annuity subject to this appeal.

[11] The date on which the Estate initially filed the Claim is not stated in the record.

4

Philadelphia, the Application, and the Orphans Court Decree. *See* Estate Br. at 25b. On November 4, 2020, a Bureau claims examiner denied the Claim. *See* R.R. at 2e.

On December 1, 2020, the Estate filed a petition for review with Treasury's Prothonotary. *See* R.R. at 1-1c. Therein, the Estate represented:

> DHS[] possesses a statutory lien claim against the [E]state due to having provided significant Medicaid benefits to [Green] during her last illness. Aside from other reasons stated herein, the [Annuity] was a "reachable" asset owned by [] Green and[,] had it been disclosed by her to DHS, it would have been expended for her care during her lifetime, as she was the owner of the asset. As it was not disclosed, [DHS has] had to pursue it as an asset of the [E]state[.]

R.R. at 1. The Estate asserted that the beneficiary portion of the Annuity was void or voidable because information necessary to identify Mildred Williams was omitted from the Application, and there is no ascertainable way to identify which of the thousands of Mildred Williamses was entitled to the Annuity. The Estate declared that the Annuity was an impermissible asset transfer and, under such circumstances, it is "[t]he sole and only *correct claimant*." R.R. at 1a.

On February 4, 2021, Treasury filed an Answer and New Matter to the Estate's petition for review. In its Answer, Treasury admitted the Application did not contain Mildred Williams's Social Security number, but denied that the Annuity was an impermissible asset transfer. Treasury explained:

> [The Estate's] inability to locate the beneficiary does not negate the beneficiary's entitlement. Adhering to [the Estate's] logic would result in Treasury paying a claim to an adverse party simply because [the Estate was] unable to locate the listed beneficiary. Doing so would be in direct contradiction to Treasury's statutory obligations as custodian of unclaimed funds, and the General Assembly's intent on ensuring property is returned to the rightful owner.

5

R.R. at 2. In its New Matter, Treasury alleged that, because the Annuity was discovered after Green's death, Mildred Williams is the rightful owner, and Treasury remains liable for it until it is handed over to Mildred Williams or her heirs. *See* R.R. at 2a-2b.

Treasury assigned a hearing officer to conduct a hearing regarding the Claim. The hearing officer notified the parties that a pre-hearing conference would be held on February 22, 2021, and directed the parties to discuss their discovery needs in advance of the pre-hearing conference. On February 16, 2021, the Estate sent Treasury a discovery request. By letter dated February 22, 2021, Treasury provided the Estate with the Claim Information Sheet, the LexisNexis report on Green, the Affidavit of DHS Third-Party Liability Program Investigator Supervisor Jason Arnold, the Claim History for Property I.D. #22404849, the Property Owner Summary for Property I.D. #22404849, an Amnesty Declaration, a November 19, 2018 email exchange between RiverSource and Treasury, and the Application. *See* R.R. at 3-3m, 4a-4b. Treasury also later supplied a sample chart of claims paid by Treasury and the dates they were reported by the holders, reflecting that significant time can pass before an owner claims property in Treasury's custody.[12] *See* Certified Record (C.R.) Item 12.

Also on February 22, 2021, the hearing officer conducted the pre-hearing conference, at which the parties agreed that the documents filed and supplied by the parties would constitute the entire record, and the parties would brief their respective positions, which they did. In its brief, the Estate argued that Green's ineffective designation of the Annuity beneficiary makes the benefit payable to the Estate, plus Green's fraudulent failure to disclose the Annuity created a special entitlement in DHS to the funds. *See* R.R. at 5-5i. Treasury responded in its brief

[12] For example, in 2018, Treasury paid out funds reported by a holder to Treasury in 1973. *See* Certified Record Item 12 at 5; *see also* Final Dec. at 6 n.1.

6

that any potential fraud is irrelevant because Treasury has a fiduciary duty to ensure safekeeping of escheated property until claimed by its rightful owner, the General Assembly did not intend for Treasury to assess the validity of annuity contracts, and the Estate is attempting to modify the Annuity despite its unambiguous terms. *See* C.R. Item 14. In its rebuttal brief, the Estate asserted that it was not modifying the Annuity, but attempting to have it enforced by its terms. *See* R.R. at 6-6f.

On June 10, 2021, the hearing officer issued the Final Decision, therein denying the Claim on the basis that the Estate failed to establish entitlement to the Annuity by a preponderance of evidence. *See* Estate Br. at 2a-2p. On July 6, 2021, the Estate appealed to this Court.[13]

Preliminarily,

> [p]roperty that is presumed abandoned is subject to the custody and control of the Commonwealth [of Pennsylvania (Commonwealth)]. Section 1301.2 of the [Act], 72 P.S. § 1301.2. Property is presumed abandoned if it is unclaimed by the apparent owner for a specified period of time. . . .[14] Section 1301.6 of the [Act], 72 P.S. § 1301.6. Once the period of time has passed and the

---

[13] This Court's review of a Treasury order deciding a claim to escheated annuity proceeds "is limited to determining whether an error of law was committed, whether the hearing officer's necessary findings of fact are supported by substantial evidence and whether constitutional rights were violated." *Morris v. Pa. Treasury Dep't Bureau of Unclaimed Prop.*, 152 A.3d 1083, 1086 n.2 (Pa. Cmwlth. 2016).

[14] Section 1301.4(a) of the Act specifies, in relevant part:

> In the case of life insurance, the following property held or owing by an insurer is presumed abandoned and unclaimed:

> 1. Any moneys held or owing by an insurer as established by its records under any contract of annuity . . . unclaimed and unpaid for more than three (3) years after the moneys have or shall become due and payable under the provisions of such contract of annuity . . . .

72 P.S. § 1301.4(a). This Court acknowledges that the General Assembly enacted Section 1 of the Act of November 3, 2016, P.L. 132, 40 Pa.C.S. § 3703(c) which, effective October 30, 2017, provided that if designated beneficiaries cannot be located, the three years is calculated from the insurance company's notice of death, and supersedes conflicting Act provisions. However, the new calculation date was not in effect relative to the instant Claim.

property is presumed abandoned, the holder of the property must file with [Treasury] a report identifying such property. Section 1301.11 of the [Act], 72 P.S. § 1301.11. [Treasury] is then required to publish a notice of the existence of the property and to attempt to notify by mail the possible owner of the property. Section 1301.12 of the [Act], 72 P.S. § 1301.12. If the property is not claimed from the property holder (financial institutions, insurers, utilities, business associations, fiduciaries, courts and public officers and agencies), the property is paid or delivered to [Treasury]. Section 1301.13(a) of the [Act], 72 P.S. § 1301.13(a).

*Smolow v. Hafer*, 867 A.2d 767, 769 n.2 (Pa. Cmwlth. 2005), *aff'd*, 959 A.2d 298 (Pa. 2008) (*Smolow II*). "Upon the payment or delivery of the property to [Treasury], the Commonwealth shall assume custody and shall be responsible for the safekeeping thereof[,]" in perpetuity, until the owner claims it. Section 1301.14 of the Act, 72 P.S. § 1301.14; *see also Smolow II*.

Section 1301.19 of the Act declares that "[a]ny person claiming an interest in any property paid or delivered to the Commonwealth under this article may file a claim thereto or to the proceeds from the sale thereof on the form prescribed by the State Treasurer." 72 P.S. § 1301.19. Section 1301.20(a) of the Act provides that Treasury "shall consider any claim filed under this article and may hold a hearing and receive evidence concerning it." 72 P.S. § 1301.20(a). "The burden of proof in an administrative proceeding under the [Act] is on the claimant to show by a preponderance of the evidence that he is entitled to the property that he seeks." *Morris v. Pa. Treasury Dep't Bureau of Unclaimed Prop.*, 152 A.3d 1083, 1086 (Pa. Cmwlth. 2016). "A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to a more likely than not inquiry."[15] *Borough of Pottstown*

---

[15] "A preponderance of the evidence is 'such proof as leads the fact-finder . . . to find that the existence of a contested fact is more probable than its nonexistence.'" *Hamilton v. Pa. State Emps. Ret. Bd.*, 194 A.3d 1147, 1155 (Pa. Cmwlth. 2018) (quoting *Sigafoos v. Pa. Bd. of Prob. & Parole*, 503 A.2d 1076, 1079 (Pa. Cmwlth. 1986)).

*v. Suber-Aponte*, 202 A.3d 173, 180 n.11 (Pa. Cmwlth. 2019) (quoting *Del. Cnty. v. Schaefer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012)).  In these proceedings, Treasury or its hearing officer is the fact-finder.  *See Morris*; *see also Lepre v. Dep't of Treasury* (Pa. Cmwlth. No. 1186 C.D. 2012, filed Mar. 4, 2013), slip op. at 6.[16]

In the instant matter, the Estate argues that Treasury erred by concluding that the Estate failed to prove its entitlement to the Annuity under the Act, where the named beneficiary is insufficiently identified and the Orphans Court ordered RiverSource to remit the Annuity to the Estate.

"[T]he legislative objective of [the Act is to] giv[e] the Commonwealth custody of [] property while seeking ultimately to return it to its **rightful owner**." *Del. Cnty. v. First Union Corp.*, 992 A.2d 112, 119 (Pa. 2010) (emphasis added).  Section 1301.1 of the Act defines *owner* as

> a person that has a legal or equitable interest in property subject to this article or **a person whose name appears on the record of a holder as the person entitled to property held**, issued or owing by the holder and shall include a depositor in case of a deposit, a creditor, claimant or payee in case of other choses in action and a legal representative of the person with the interest, the entitled person, the depositor, the creditor, the claimant or the payee.

72 P.S. § 1301.1 (emphasis added).

Based on the record evidence, the hearing officer concluded that, "pursuant to the [d]octrine of [*c*]*ustodia legis*, [] the rightful owner of [the Annuity] is the designated beneficiary, Mildred Williams[,] and not the Estate."  Final Dec. at 7.  The hearing officer described Treasury's statutory duty to hold property in safekeeping in perpetuity for the rightful owner or his/her heirs.  *See* Final Dec. at

---

[16] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported panel decision of this Court issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent.  *Lepre* is cited herein for its persuasive value.

5-6. The hearing officer stated that the General Assembly did not contemplate the Estate to be the owner of property for which a beneficiary has been listed, nor did it impose on Treasury the burden and/or responsibility to interpret annuity contracts to which it was not a party.[17] *See* Final Dec. at 6.

The hearing officer declared that the Estate's claim that Green purchased the Annuity to reduce her cash on hand and make herself eligible for Medicaid sooner and, thus, it would have been reachable by DHS, is "meritless and irrelevant" to the Estate's Claim. Final Dec. at 8. Specifically, the hearing officer declared that, whether "[a]ny claim a creditor, such as DHS, allegedly has against an estate is not a determination Treasury, as custodian, has the authority to make, nor will [it] take [that] into consideration when determining entitlement." *Id.*

Further, the hearing officer asserted that, although there is a presumption that a Medicaid applicant's disposal of assets for less than fair market value within the preceding three years was to qualify for Medicaid, *see Gilroy v. Dep't of Pub. Welfare*, 946 A.2d 194 (Pa. Cmwlth. 2008), the applicant may rebut that presumption with convincing evidence,[18] *see* Section 178.105 of DHS's Regulations, 55 Pa. Code § 178.105, and

---

[17] The hearing officer expounded on the basis for Treasury's limitations:

> To follow [the Estate's] reasoning, Treasury would have to be the arbiter of third-party claims. Treasury would be inundated by creditors filing claims against escheated property that the creditors assert the person for whom funds were escheated owes the creditor. What one creditor may be entitled to the proceeds over another creditor? Is the claim of the creditor seeking the funds entitled to make the claim? Those are not decisions Treasury is authorized to make.

Final Dec. at 7.

[18] The hearing officer observed:

> Convincing evidence includes documentary and nondocumentary evidence that provides proof of circumstances surrounding the transfer, including: (1) the

10

[t]he Estate has not provided any evidence proving compliance. The record is void of evidence proving otherwise, which suggests that DHS failed to provide the [] Estate (which DHS, as [a]dministrator[,] controlled) the opportunity to rebut the presumption that she divested assets for Medicaid eligibility, while still asserting entitlement to the [Annuity] alleging Green committed fraud. In addition to such a position being irrelevant to the issue of [the Estate's] entitlement, it is inconsistent with relevant case law and the applicability of Section 178.105 [of DHS's Regulations], and must be rejected, resulting in the property ownership interest remaining with [Mildred] Williams.

Final Dec. at 10-11. The hearing officer added: "Just because Green is dead and cannot personally rebut the presumption of impermissible transfer should not give the Estate or DHS a higher standing in this case." *Id*. at 11.

In addition, the hearing officer held:

An insured having the liberty to choose a beneficiary is the clearest form of their intent as to who [she] want[s] to receive death benefits upon [her] death. Here, it is clear that Green intended to list [Mildred] Williams as the beneficiary. If Green intended for the Estate to get the [Annuity], Green would have either explicitly listed the Estate as the beneficiary, or not listed a beneficiary at all. However, Green did not - she listed [Mildred] Williams, who remains to have the ownership interest in the [Annuity].

In support of the Estate's posthumous argument that the [Annuity's] beneficiary provision should be modified, [it]

---

purpose for transferring the asset; (2) the attempts to dispose of the asset at its fair market value; (3) the reason for accepting less than fair market value of the asset; (4) the means of, or plans for, self-support after the transfer; and (5) the individual's relationship to the person to whom the asset was transferred.

*Gilroy*, 946 A.2d at 196-[]97 (citing 55 Pa. Code § 178.105(c))[; *see also Dempsey* (relating to annuities)].

Final Dec. at 10 (footnote omitted).

11

cites the definition of "Beneficiary" and "Recordkeeping services" in [Section 3702 of what is referred to herein as the Insurance Code (Insurance Code) (relating to unclaimed life insurance benefits),[19]] 40 Pa.C.S. § 3702[,] asserting River[S]ource failed [its] duty to collect the Social Security [n]umber and date of birth of [Mildred] Williams; however, the Estate's reliance on Section 3702 [of the Insurance Code] is misplaced and inaccurate. Section 3702 [of the Insurance Code] requires such information of the <u>insured</u> -- not the beneficiary. The Estate further asserts that [Section 618(A)(9) of The Insurance Department Act of 1921 (Insurance Act),[20]] 40

---

[19] Section 3702 of the Insurance Code defines *beneficiary* as "[a] person designated to receive the proceeds from a life insurance policy or retained asset account." 40 Pa.C.S. § 3702. *Recordkeeping services* is defined therein as:

> Those circumstances under which an insurer has agreed with a group policy or contract customer to be responsible for obtaining, maintaining and administering in its own or its agents' systems at least the following information about each individual insured under an insured's group insurance contract, or a line of coverage under the contract:

> (1) Social Security number or name and date of birth;
> (2) beneficiary designation information;
> (3) coverage eligibility;
> (4) benefit amount; and
> (5) premium payment status.

*Id.*

[20] Act of May 17, 1921, P.L. 682, *as amended*, added by Section 2 of the Act of May 25, 1951, P.L. 417. Section 618(A) of the Insurance Act provides, in relevant part:

> [E]ach such policy delivered or issued for delivery to any person in this Commonwealth shall contain the provisions specified in this subsection in the words in which the same appear in this section:

> . . . .

> (9) A provision as follows:

> Payment of Claims: Indemnity for loss of life will be payable in accordance with the beneficiary designation and the provisions respecting such payment which may be prescribed herein and effective at the time of payment. If no such designation or provision is then effective, such indemnity shall be payable to the estate of the insured. Any other accrued indemnities unpaid at the insured's death may, at the option of the insurer, be paid either to such

12

P.S. § 753(A)(9)[,] requires the [Annuity] be returned to the Estate due to the beneficiary designation being ineffective. Again, the Estate's reliance is misplaced and inaccurate. Section 753 [of the Insurance Act] simply specifies provisions that must be included in policy contracts, which is wholly irrelevant to the issue of the Estate proving entitlement to the [Annuity].

Final Dec. at 11-13 (footnotes omitted).

The hearing officer also held: "[T]o turn[]over [] funds to the Estate [pursuant to the Orphans Court Decree] . . . would be a garnishment[21] or attachment which is preempted by [c]ustodia legis and[,] furthermore[,] Treasury was not a party to that proceeding and therefore not bound by that [o]rder." Final Dec. at 13. Moreover, the hearing officer observed: "Treasury has shown . . . that [unclaimed] property . . . in the custody of Treasury for over 40 years ha[s] been claimed and many properties in Treasury's custody for 36 years have been claimed. Therefore, it is possible that the proper Mildred Williams can appear to claim these funds." Final Dec. at 11.

This Court has explained:

"It is not within the province of this Court to retry the case or to make independent factual findings and conclusions of law." *Dep't of Transp. v. Herbert R. Imbt, Inc.*, . . . 630 A.2d 550, 551 n.1 ([Pa. Cmwlth.] 1993). To the contrary, the agency is entrusted with the duty of fact-finding, and we may neither assist nor interfere with this function. The agency's role as fact-finder includes determining the credibility of witnesses and resolving conflicting

---

beneficiary or to such estate. All other indemnities will be payable to the insured.

40 P.S. § 753(A).

[21] "Garnishment is a 'proceeding through which a creditor collects his debt out of property of the debtor in the hands of a third party, . . . and may be used to determine whether the garnishee owes a debt to the judgment debtor, or has property of the judgment debtor.'" *Pa. State Troopers Ass'n v. Pa. State Police, Lost & Damaged Prop. Bd. of Appeal*, 898 A.2d 43, 48 (Pa. Cmwlth. 2006) (quoting *Garden State Standardbred Sales Co., Inc. v. Seese*, 611 A.2d 1239, 1241 (Pa. Super. 1992) (citations omitted)).

evidence. An agency's findings need not be supported by uncontradicted evidence, so long as they are supported by substantial evidence.[22] If the agency's findings are supported by substantial evidence, they are binding on this Court. Additionally, we view the evidence and all reasonable inferences arising from the evidence in the light most favorable to the prevailing party.

*Balshy v. Pa. State Police*, 988 A.2d 813, 835 (Pa. Cmwlth. 2010) (citations omitted); *see also Brenckman v. Dep't of Hum. Servs.*, 222 A.3d 38 (Pa. Cmwlth. 2019).

The General Assembly expressly made Treasury responsible for holding unclaimed property in perpetuity until collected by its owner or the owner's heirs, without a statute of limitations or an exception for property to which creditors purport to have an interest. There was no record evidence before the hearing examiner that Green had the opportunity and/or would have been unable to rebut the presumption that she purchased the Annuity to dispose of assets to qualify for Medicaid. Rather, the record supports that Green designated Mildred Williams as her beneficiary on the Application and, upon Green's death, Mildred Williams was entitled to the Annuity. However, RiverSource failed to obtain Mildred Williams's Social Security number on the Application, and the Estate has failed to demonstrate its legal entitlement to the Annuity on that basis, or because RiverSource and Treasury have, to date, been unable to locate Mildred Williams or her heirs.

Unfortunately, the Orphans Court Decree supplied with this record does not, on its face, reflect the circumstances underlying the basis for, or subject of, the litigation that led to its issuance. Although RiverSource was named in the Orphans Court Decree, it is not clear that the subject of the underlying litigation was *this*

---

[22] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, [but must be] . . . more than a scintilla and must do more than create a suspicion of the existence of the fact to be established.'" *Bennett v. Bureau of Pro. & Occupational Affairs, State Bd. of Chiropractic*, 214 A.3d 728, 735 (Pa. Cmwlth. 2019) (quoting *Yi v. State Bd. of Veterinary Med.*, 960 A.2d 864, 874 (Pa. Cmwlth. 2008) (citation omitted)).

14

Annuity. The Orphans Court Decree did not reference the Annuity contract number, and the dollar amount listed in the Orphans Court Decree does not correspond with the Application or any other documents related to this Claim. At most, the Orphans Court Decree established that RiverSource owed the Estate money. However, even if the subject of the Orphans Court Decree was *this* Annuity, because the Orphans Court Decree was issued based on RiverSource's purported default relative to *ex parte* pleadings, it is not evident to this Court that RiverSource was represented before the Orphans Court or even had notice of those proceedings.[23] In addition, notwithstanding that the Orphans Court Decree ordered RiverSource to remit payment to the Estate within 20 days of the Decree's service on RiverSource and authorized the Estate to seek sanctions for RiverSource's failure to timely pay, there is no record evidence that the Estate ever sought payment from RiverSource.[24] Treasury was not in a position to make these determinations, but the file underlying the Orphans Court Decree could potentially resolve these questions.

Further, even if the Orphans Court Decree disposed of the Annuity, it is not clear under the law and/or based on the record evidence that RiverSource possessed the ability to comply with the Orphans Court Decree.[25] Although the specific date on which RiverSource reported and transferred the Annuity to Treasury

---

[23] Likewise, the Orphans Court Decree does not reflect whether Mildred Williams was a named party, or whether the Estate attempted to serve or even notify a Mildred Williams of the action.

[24] Although not evidence, at the March 7, 2022 oral argument before this Court, Cohen admitted that the Estate did not seek a writ of execution to enforce the judgment, *see* Pa.R.Civ.P. 3102, 3252, or take other further action against RiverSource.

In addition, Treasury's counsel represented at oral argument that, if RiverSource had determined that it incorrectly transferred the Annuity to Treasury, Treasury has a mechanism in place whereby RiverSource could correct the error. The Estate did not avail itself of this option.

[25] This fact could explain why the Estate never sought to enforce the Orphans Court Decree and collect on the Annuity from RiverSource.

15

is not stated, the record clearly reflects, and the parties agree, that it occurred in 2016. Section 1301.11 of the Act directs, in pertinent part:

> (a) Every person holding property which became subject to custody and control of the Commonwealth under this article during the preceding year **shall report to** [**Treasury**] as hereinafter provided.
>
> . . . .
>
> (d) The report shall be filed **on or before April 15** of the year following the year in which the property first became subject to custody and control of the Commonwealth under this article. . . .

72 P.S. § 1301.11 (emphasis added). Section 1301.13(a) of the Act, likewise, provides that holders of property that becomes subject to Treasury's custody and control shall "pay or deliver" it to Treasury "on or before April 15[.]" 72 P.S. § 1301.13. Thus, to be compliant with the Act, RiverSource had to have reported and transferred the Annuity to Treasury in 2016 on or before *April 15*, 2016, at least several weeks *before* the May 11, 2016 Orphans Court Decree was issued.[26] Accordingly, when the Orphans Court issued its Decree, RiverSource may not have had the ability to transfer the Annuity to the Estate.

> Finally, this Court observes:
>
> The doctrine of *custodia legis* provides generally that funds or other property in the possession of the Commonwealth or one of its political subdivisions, owing to individuals, are not subject to attachment under the public policy that the government should be free from the annoyance and uncertainty arising out of disputes between those to whom the [Commonwealth] owes the property it

---

[26] Notwithstanding, in its brief to this Court, the Estate declared: "The [Orphans Court] has decreed that [RiverSource] should pay the [Annuity] proceeds to the [] [E]state, but [it] instead paid [Treasury]." Estate Br. at 7. At the March 7, 2022 oral argument before this Court, Cohen again represented that the Orphans Court Decree was issued *before* RiverSource transferred the Annuity to Treasury. However, the law and the record belie that statement.

16

> holds and those claiming a right to the same property by garnishment.

*Ramins v. Chem. Decontamination Corp.*, 560 A.2d 836, 840 (Pa. Cmwlth. 1989) (emphasis added); *see also City of Easton v. Marra*, 862 A.2d 170, 173 (Pa. Cmwlth. 2004) ("Property *in custodia legis* is accorded immunity from attachment or execution, for, as the rationale goes, to allow such actions would require a public official to appear and defend a multitude of actions regarding the right to possession and would cause confusion and delay in the execution of legal process."). However, "an exception to th[e] doctrine [of *custodia legis*] exists where the public purpose for which the property has been held has been achieved, and the property merely awaits distribution[,]" because the doctrine is not frustrated by permitting disbursement in that instance. *Pa. Higher Educ. Assistance Agency v. Lal*, 714 A.2d 1116, 1119 (Pa. Cmwlth. 1998); *see also Buchholz v. Cam*, 430 A.2d 1199 (Pa. Super. 1981). Accordingly, depending on the underlying circumstances, the Annuity may be subject to attachment while in Treasury's custody and control. If the Orphans Court file establishes that the Annuity *was* the subject of the Orphans Court Decree, and the Orphans Court Decree governs the Annuity's funds, then Treasury should pay the Estate.

In light of the Orphans Court Decree and questions raised therefrom, Treasury's Final Decision is vacated and this matter is remanded to Treasury for further proceedings consistent with this Opinion.

 

_____
ANNE E. COVEY, Judge

Judge Wallace did not participate in the decision in this case.

17

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Estate of Doretha Green,     :
           Petitioner     :
           :
           v.            :
           :
Commonwealth of Pennsylvania,     :
Treasury Department, Bureau of     :
Unclaimed Property,     :    No. 749 C.D. 2021
           Respondent     :

## O R D E R

AND NOW, this 21st day of September, 2022, the Commonwealth of Pennsylvania, Treasury Department, Bureau of Unclaimed Property's (Treasury) June 10, 2021 Final Decision and Order is vacated, and the matter is remanded to Treasury for further proceedings consistent with this Opinion.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge